Argued February 11; demurrer to writ sustained July 14; motion to strike defendant's amended return allowed September 29, 1942

STATE EX REL. KIESEL'S ESTATE *v.*
BISHOP ET AL.

(127 P. (2d) 736, 129 P. (2d) 276)

Before KELLY, Chief Justice, and BAILEY, LUSK, RAND, ROSSMAN and BRAND, Associate Justices.

*P. J. Gallagher*, of Ontario (Gallagher & Gallagher, of Ontario, on the brief), for plaintiff.

*George T. Cochran*, of La Grande, and *Carl H. Coad*, of Nyssa (Cochran & Eberhard, of La Grande, on the brief), for defendants.

ROSSMAN, J. The plaintiff filed in this court a petition for a writ of mandamus which was followed with the issuance of an alternative writ. After the service of the latter the defendants filed a return and answer to which the plaintiff demurred upon the ground that the answer fails to state facts sufficient to constitute a defense. Thus was created the issue before us.

Three of the defendants are the supervisors of the Nyssa-Arcadia Drainage District. A fourth is the county judge of Malheur county, that being the county in which the district is located. The remaining two defendants are the county commissioners of Malheur county.

The relief which the plaintiff seeks is the entry of an order commanding the defendants to levy a tax sufficient to pay bonds issued by the drainage district and owned by the plaintiff in the amount of $23,000.

The Nyssa-Arcadia Drainage District was organized in 1916, pursuant to 1915 Session Laws, Ch. 340. Its area when organized was 5,090.83 acres. The legality of that municipal body was sustained by this court in *State v. Nyssa-Arcadia Drainage District*, 80 Or. 524, 157 P. 804. In 1916 the district issued and sold $70,000 of bonds. In 1918, when 204 acres were added to the district, it issued and sold an additional $15,000 of bonds. The proceeds of both issues were used in the construction of drainage facilities. Plaintiff owns bonds of both issues.

454

The defendants concede that none of the bonds owned by the plaintiff has been paid. They present two main contentions: (a) The $15,000 issue is invalid; and (b) the supervisors of the district have performed all of the acts required of them by the statutes of this state to make provision for the payment of its bonded indebtedness and are not authorized to levy any additional taxes for the payment of the bonds.

The $15,000 issue, to which the record refers as the 1918 issue, was issued after the additional 204 acres had been added to the district. The addition of that tract to the district was followed by an extension of the district's facilities to the expanded area and by further development of the main works.

The first of the above two contentions is based upon a claim that when the supervisors authorized the 1918 issue they exceeded the authority conferred by 1915 Session Laws, Ch. 340. Specifically, the defendants contend that the issuance of those bonds was not preceded by a finding that the additional construction would confer a benefit upon the original 5,090.83 acres; and, further, that no notice was given to the owners of the 5,090.83 acres before the proceedings were begun which resulted in the 1918 issue. The defendants also contend that the record shows that the commissioners found that benefits amounting to no more than $3,355.91 would be conferred upon the 204 acres as a result of reclaiming that body of land. The estimated cost of the construction work upon the 204 acres was $2,680.20. The plaintiff contends that the commissioners found that the 204-acre tract would be benefited to the extent of $11,920.

The second of the above contentions may be stated more specifically thus: The defendants claim that the supervisors of a drainage district are authorized by

1915 Session Laws, Ch. 340, to levy only one tax for the discharge of any issue of bonds, and that if the levy fails to yield returns sufficient for the payment of all the bonds, the loss must be borne by the unpaid bondholder.

We shall defer further mention of the facts until we have first reviewed the provisions of the statute which lend significance to the facts. Since there is no contention concerning the validity of the drainage district's organization, we shall omit mention of those portions of the statute which delineate the method of organization.

■ Section 8 of 1915 Session Laws, Ch. 340, requires the supervisors of a drainage district which contemplates the performance of reclamation work to appoint an engineer, and makes it incumbent upon him to prepare the needed plans. In the event his plans are adopted by the supervisors they become known as "the plan for reclamation." Section 11 requires the county judge, after the plans have been approved by the board of supervisors, to appoint three commissioners; and § 13 provides that the commissioners shall assess the amount of benefits and the damages, if any, that will accrue to each parcel of land within the district by reason of the reclamation project. Section 14 requires the county clerk to publish the report of the commissioners for three weeks. Section 15 permits owners of land in the district to file objections to the report of the commissioners. It authorizes the county court upon hearing of the objections to make any modifications to the report of the commissioners that may be equitable. Continuing, the section says that if the county court finds "that the estimated cost of the improvement contemplated in 'the plan for reclamation' is less than the benefits to be derived therefrom; then

the court shall approve and confirm said commissioners' report as so amended and modified." Thus we see that all "plans for reclamation" must be submitted to the local county court for rejection, modification or approval before any construction work can be undertaken. Further, no approval can be given unless the estimated cost of construction is less than "the benefits to be derived therefrom." Section 16 confers upon the board of supervisors authority to proceed with construction in the event the county court approved "the plan for reclamation." Section 17 declares that after the list of assessed benefits and damages has been received from the county court the supervisors shall, "without any unnecessary delay, levy a tax of such portion of said benefits on all lands in the district to which benefits have been assessed, as may be found necessary by the board of supervisors, to pay the costs of the completion of the proposed works and improvements as shown in said 'plan for reclamation' * * * plus ten per cent of said total amount for emergencies. The said tax shall be apportioned to and levied on each tract of land in said district in proportion to the benefits assessed and not in excess thereof, and in case bonds are issued as provided herein and hereafter, then the amount of the interest (as estimated by said board of supervisors) which will accrue on such bonds shall be included and added to the said tax * * *." Thus we see that § 17 makes provision for the payment of the construction work if no bonds were issued, and for the payment of the latter if construction was followed by their issuance. It will also be seen that the amount of the tax, if no bonds were issued, is "the cost of the completion" plus ten per cent "for emergencies"; but if bonds were issued, then to the amount just indicated there must be added "the

interest (as estimated by said board of supervisors)."
The tax is not necessarily payable at once. Section 18,
to which we now proceed, states the manner in which
the gross tax must be collected. It directs the board
of supervisors to each year "determine, order and levy
the amount of the annual installment of the total taxes
levied under the preceding section, which shall become
due and be collected during said year at the same time
and in the same manner that state and county taxes
are due and collected * * *." Section 24 authorizes
the county court to amend the decree which incorpo-
rated the district. The section provides that if the
amendment changes "the plan for reclamation" or
the boundary lines of the district, the court shall ap-
point commissioners and pursue the same course as
when a district is first organized. Section 25 empowers
the board of supervisors to "issue bonds not to exceed
ninety per cent of the total amount of the taxes levied"
under the provisions of Section 17. It will be recalled
that § 17 directs the board of supervisors to levy a
tax "without any unnecessary delay" for the payment
of the construction work after the board has received
from the county court the order which approved or
modified the report of the commissioners. It will also
be recalled that the levy must be enough to pay the
cost of the construction work, but must not exceed the
total "benefits assessed." We have just seen from
the language of § 25 that the bond issue shall not
"exceed ninety per cent of the total amount of the taxes
levied." Continuing, § 25 supplements the language
of § 17 which makes provision for the payment of the
authorized bonds. It says:

> "A sufficient amount of the drainage tax shall
> be appropriated by the board of supervisors for
> the purpose of paying the principal and interest

of the said bonds and the same shall, when collected, be preserved in a separate fund for that purpose and no other. All bonds and coupons not paid at maturity shall bear interest at the rate of six per cent per annum from maturity until paid, or until sufficient funds have been deposited at the place of payment and the said interest shall be appropriated by the board of supervisors out of the penalties and interest collected on delinquent taxes or any other available funds of the district. * * * It shall be the duty of said board of supervisors in making the annual tax levy, as heretofore provided, to take into account the maturing of bonds and interest on all bonds, and to make ample provisions in advance for the payment thereof. In case the proceeds of the original tax levy made under the provisions of Section 17 of this Act are not sufficient to pay the principal and interest of all bonds issued, then the board of supervisors shall make such additional levy or levies upon benefits assessed as are necessary for this purpose, and under no circumstances shall any tax levies be made that will in any manner or to any extent impair the security of said bonds or the fund available for the payment of the principal and interest of the same."

Section 26 authorizes the board of supervisors to levy a tax for the discharge of current expenses and the maintenance of the improvements. Section 27 authorizes the supervisors "to formulate new or amended plans containing new ditches", etc. The same section also says:

"If it should be found at any time that the amount of total tax levied under the provisions of Section 17 is insufficient to pay cost of works set out in 'the plan for reclamation' or additional work done under the provisions of this section the board of supervisors may make an additional levy to provide funds to complete the work, provided

the total of all levies of such tax does not exceed the total amount of benefits assessed.''

Sections 28 and 29, being the last two sections of the act, have no bearing upon the issue before us.

■ Possibly a word or two of recapitulation may serve a useful purpose. The benefits set forth in the ''Commissioners' report, as confirmed or amended by the Court'' (county court) constitute the limit of the district's taxing power for the payment of construction work, whether the indebtedness remains in its original form or has assumed the form of bonds. In legal contemplation the assessment is against the benefits conferred by the improvement, and the annual sums payable are not taxes in the ordinary meaning of that term; but in this case those details are of no consequence. Although the tax is levied by the board of supervisors, which also determines the amount of the annual installments, payment is made at the same time as all other taxes are paid and to the same county officials.

Section 2 of 1919 Session Laws, Ch. 184, amended § 18 of 1915 Session Laws, Ch. 340, by making it read:

''The board of supervisors shall each year make a computation of the whole amount of money to be raised by the district through assessments for the ensuing year for any and all purposes whatsoever in carrying out the provisions of this act, including estimated delinquencies on assessments; and said amount of money, when so determined by said board, shall be and constitute an assessment upon all of the land included in said district and shall be apportioned by said board in accordance with the report of the commissioners as confirmed or amended by the court as provided for in Section 15 of Chapter 340 of the general laws of Oregon for 1915. * * *''

March 31, 1916, the board of supervisors of the district filed with the county clerk of Malheur county a Plan for Reclamation which the board had adopted. The defendants concede that thereafter the proper procedure was followed so that the county court of Malheur county "duly made * * * and entered" on July 18, 1916, an order approving the plan. About the same time, according to the answer, the county court appointed three commissioners "who duly qualified as such" and who later "duly filed their report" setting forth benefits and damages. Some objections to the report were filed. The answer next says:

"* * * thereafter, upon notice given * * * a hearing was duly held upon the report of the said Commissioners and the objections thereto, and said report of Commissioners was amended and modified, and the said County Court by its order duly made and entered on the 6th day of October, 1916, reduced the benefits assessed against one M. H. Plummer, and overruled the other objections, and duly approved and confirmed the report of Commissioners as so amended and modified. * * * That the said report of Commissioners, as modified and approved, found that the total cost of constructing the said 'Plan for Reclamation' would be $61,539.36, and that the benefits therefrom would amount to $79,890.55, and would be in an amount sufficient to authorize a bond issue of $70,000 allowing the ten per cent for emergencies as required by statute. That the report of Commissioners as amended and confirmed, apportioned the said cost and total benefits to each parcel of land * * * according to the benefits accruing thereto * * *."

October 16, 1916, according to the answer, the board of supervisors by resolution adjudged it best to issue

and sell $70,000 of bonds to pay the cost of the construction work. Continuing, the answer declares:

"That the Board of Supervisors by such Resolution further levied a tax against the lands of the district in the amount of $78,648.31 to pay the principal amount of said bonds, and ordered the Secretary of the district to enter on the 'Drainage Tax Record of the Nyssa-Arcadia Drainage District' such tax and extend the same against each tract of land in proportion to the benefits thereto, * * *."

The answer says that the secretary obeyed those instructions. November 1, 1916, the board sold the bonds authorized by the above-mentioned resolution at a price of $97.27 for each $100 denomination of bond. Each bond bore the signatures of the president and the secretary of the board. Each recited:

"Nyssa-Arcadia Drainage District, Malheur county, State of Oregon, hereby covenants and warrants with the holder of this bond that all acts and things precedent to the issue of this bond have been done and performed in the manner and form and at the times required by law and that every requirement of law relating to the issue of this bond has been duly complied with and that this bond is within every debt and other limit prescribed by the constitution or laws of the State of Oregon and that a proper levy of taxes of benefits has been made for the payment of the principal and interest of this bond when the same falls due."

November 4, 1916, the board of supervisors awarded a contract for the construction of the work. The amount was $58,567.75, subject to a discount of 2½ per cent for cash payment. The contractor completed performance of the work and was paid out of the funds provided by the bond issue.

Continuing, the answer states:

"That thereafter, and on or about the 6th day
of August, 1917, after petition filed, and notice
given, the County Court of Malheur County, Ore-
gon, duly made its order amending and changing
the boundaries of the Nyssa-Arcadia Drainage
District so as to include the following described
land * * *."

Here follows a description of the 204 acres which we
have already mentioned.

The answer continues:

"That a 'Supplemental Plan for Reclamation'
for said added lands was duly adopted by the Board
of Supervisors and filed with the County Clerk,
* * * and that a duly appointed, qualified and
acting Board of Commissioners assessed the bene-
fits and damages resulting and accruing from the
construction of the work in accordance with the
said 'Supplemental Plan for Reclamation' and that
on the 23rd day of August, 1917, said Board of
Commissioners filed their report * * *; that
thereafter, on to-wit, the 25th day of September,
1917, after due notice and hearing, the County Court
of Malheur County, Oregon, by an order duly made
and entered, settled and approved said report
* * *. That thereafter, without resolution or
order of the Board of Supervisors of the district,
there was extended upon the 'Drainage Tax Record'
of said district a purported tax levy against the
properties so included within the limits of the
district, in the amount as set forth in said 'Drainage
Tax Record.' "

Further, the answer avers that the board of super-
visors on April 5, 1918, through the adoption of a reso-
lution, decided to issue and sell $15,000 additional
bonds to provide means for the payment of the work
required by the Supplemental Plan for Reclamation.

The same resolution, according to the answer, "levied a tax against all of the lands within the district including the lands included by said order of August 6, 1917, in the amount of $16,667.00 to pay the principal amount of said bonds, and ordered the secretary of the district to enter on the 'Drainage Tax Record' of the district such tax and extend the same against each tract of land in proportion to the benefits thereunto assessed. * * * pursuant to said resolution the said secretary made up and entered a tax on the said 'Drainage Tax Record' * * *." The answer avers that the bonds when issued were dated November 1, 1916, and bore the signatures of the president and the secretary of the district. Each bond contained the same recital which we quoted in a preceding paragraph from the bonds of the earlier issue. The answer further alleges:

"No 'Plan for Reclamation', either new or amended, other than the 'Plan for Reclamation' as alleged in Paragraph X of this return, and no determination or finding of costs or of benefits, other than as alleged in said Paragraph X, was made at any time."

We pause to explain that Paragraph X, from which we quoted on a preceding page, is the one that avers the adoption and approval of the Supplemental Plan for Reclamation. It speaks of a Supplemental Plan for Reclamation—not of a Plan for Reclamation. Continuing, the paragraph from which we were quoting (XIII) says:

"That the benefits determined under such 'Supplemental Plan for Reclamation' alleged in Paragraph X was the sum of $3,355.91 and no more, * * * and that the purported tax levy of $16,683.70 as shown by the drainage tax record * * * exceeded the benefits assessed, and was

> illegal * * * and was charged against property
> not determined to be benefited by the 'Supple-
> mental Plan for Reclamation' * * * And de-
> fendants allege that the said 1818 series bonds so
> issued against this illegal and void tax levy were
> illegal and void in themselves, * * *''

Continuing, the answer avers:

> ''That from time to time, commencing in 1917,
> the board of supervisors of the district levied annual
> installments of the original taxes * * * for
> the payment of interest accruing and principal of
> bonds as they matured * * *. That the total
> amount of annual installments so levied is in excess
> of the total amount of the original tax levies
> * * * and that by so levying the annual install-
> ments of tax to the full amount of original tax, the
> Board of Supervisors of the district have per-
> formed each and every act and thing to be per-
> formed by them to secure the payment of said bond
> issue of 1916 series, and of said 1918 series if the
> same be valid, and that these answering defendants
> as the Board of Supervisors of said District have
> no authority or power to levy any more or further
> taxes or assessments for the payment either of
> principal or of interest upon said bonds. * * *''

The answer admits that the bonds held, by the plain-
tiff have not been paid and attributes nonpayment to
tax delinquencies. It explains that the state has
acquired title to some tracts of land in the district
through the foreclosure of mortgages executed prior
to the issuance of these bonds and given to secure the
payment of loans made out of the irreducible school
funds, and that the foreclosure decree cancelled the
unpaid district assessments. The answer also explains
that Malheur county has foreclosed the lien of delin-
quent taxes upon some tracts, and adds: ''Upon fore-
closure by Malheur County any and all lands so fore-

closed were discharged of further lien and assessment of the district for bond and interest assessments." Finally, the answer states that the district itself acquired title to tracts of land within its boundaries by foreclosure of certificates of delinquency which it owned.

In each instance in which the answer mentions an order, plan, petition, report or other paper, it attaches to itself a copy of the document and declares that the latter is made as much ''a part of this return as though fully set forth herein.''

The board of supervisors did not intend to use the proceeds of the 1918 issue exclusively upon the 204-acre tract, as is evident from a resolution adopted by the board April 5, 1918. It declares:

''Whereas, the drainage system has been extended under approval of the said entitled Court for the purpose of benefiting said lands so included; and

''Whereas, it has been found that the works set out in the 'Plan for Reclamation' are insufficient to reclaim a part of the lands within said district, and the Board of Supervisors have formulated amended plans extending laterals and ditches so as to more effectually reclaim the said lands of said district, and to furnish the benefits assessed against said lands;

''Whereas additional works have caused an indebtedness, and it has been found that the total tax levied under the levy heretofore made, upon which bonds were issued to the amount of Seventy Thousand Dollars, and the proceeds from the sale of said bonds is insufficient to complete the work of said district; and * * *''

The adoption of that resolution preceded the issuance of the bonds.

■ It will be observed that the answer alleges that the commissioners who were appointed to determine the benefits and damages which would accrue from the Plan for Reclamation (the one filed in 1916 upon organization of the district) reported that the benefits would be $79,890.55. And it will be recalled that the answer alleges that the commissioners who determined the benefits and damages which would result from the Supplemental Plan for Reclamation (the one which followed the addition to the district of 204 acres) found that the benefits would amount to $3,355.91. The plaintiff claims that the commissioners found that the benefits which would result from the Plan for Reclamation would be $282,325.10 and that the benefits which would come from the Supplemental Plan for Reclamation would be $11,920. Both parties, in arguing their contentions, refer to exhibits attached to the answer. As we have said, the answer makes the exhibits "a part of this return as though fully set forth here." In view of that averment and the constant reference by the parties to the exhibits, we shall deem that the latter control the averment. The exhibits to which we now especially refer are the reports of the commissioners, the orders of the county court in regard to them, and orders made by the board of supervisors.

The commissioners who determined the benefits and damages which would accrue from the Plan for Reclamation made a comprehensive report. A part of it consisted of pages containing data arranged in twelve columns. In the first column the commissioners entered the owner's name; in the second, a legal description of his property; in the third, the section in which his property was located; in the fourth, the number of acres in his tract; and in the fifth to the ninth, inclusive,

(according to the commissioners' report) "the classes in which the land has been placed according to benefits received." The five columns are headed 25, 40, 40, 70 and 80. The report gives an explanation of these columns and figures. For instance, it says: "Column 5 Poor dry land is rated with the lowest benefit, 25, and will be taxes (taxed) for the Bond issue $7,000." It next says: "Column 6 Poor wet land is rated 40, and will be taxes (taxed) for Bond issue $11.20." Further, it says: "Column 8 Good land that is losing crop production by reason of a rising water table; is rated at 70, and taxed $19.60." Similar explanations are made for the other two columns. In using these numbers, 25, 40, 70 and 80, manifestly, the commissioners intended that the figures should represent something which they had in mind. The next column, being 10, is entitled "Units." The plaintiff claims that by "units" the commissioners meant "dollars" and that they employed these six columns as the means of reporting the benefits which they estimated each tract would receive from the reclamation. It will be recalled that the report, referring to these columns, said that the land had been placed in these columns "according to benefits received." We shall now illustrate by this page how the commissioners classified the land "according to benefits received." The first owner whose name appears upon these sheets, according to the fourth column owned 19.55 acres in the district. In the column entitled 70 the commissioners entered 7.55 and in the column entitled 80 they entered 12. The sum of the two is 19.55 or the number of that owner's acres. In the column entitled Units they set opposite his name 1488.5. It thus appears that the commissioners found that 7.55 acres of this owner's property would be benefited to the extent of 70 units per acre and that

12 of his acres would be benefited 80 units per acre. The total of 70 × 7.55 added to 80 × 12 is 1488.5, the number entered in the Unit column. The plaintiff claims that 1488.5 means that this owner's benefits from the work were estimated as $1488.50. The columns headed 25, 40, 40, 70 and 80 also bear the following notations: 7.00, 11.20, 11.20, 19.60 and 22.40. Explanations accompanying the sheets say that those are the amounts which the commissioners found each acre should be assessed for the improvement. For instance, an owner benefited 25 units per acre would be assessed 7.00 per acre. Thus, the owner to whom we referred a moment ago and who had 19.55 acres would be taxed, according to this report, 19.60 per acre for 7.55 of his acres and 22.40 per acre for 12 of his acres, or a total assessment against his land of 416.78. The latter figure appears in the 12th column which is entitled "Levy for Bond Issue." Those assessments were actually made when the tax was later levied.

It will be recalled from the sections of our statutes which we quoted in a preceding paragraph that the principal duty of the commissioners is to determine benefits and damages. If "Units" means dollars, then this comprehensive report set forth fully the determination of benefits; but if Units was not used in that sense its meaning has escaped detection. Likewise, if Units does not mean "benefits anticipated from the improvement," we have only two columns left to which we can look for the entry of benefits—the 11th column entitled "Cost Engineer's Estimate" and the 12th column, "Levy for Bond Issue." Clearly, those two columns cannot contain the entry of benefits. It will be recalled that the entries of the commissioners which recommended the tax levy against each tract omitted the dollar sign in the same manner as the Unit column,

yet no difficulty was experienced there through that omission.

It seems clear from the preceding explanation and calculations that "Units" was employed by the commissioners in place of the word "dollars" and that in the column thus entitled they entered the amount of benefits which they believed the reclamation project would bestow upon each tract of land. But if we need a Rosetta Stone to explain the term Units, we have it in the order of the county court which modified and then approved the report of the commissioners. The order of modification and of approval first took notice of some objections which had been filed against the report. Concerning one of the objections, it said: "The Court herein in making such reduction has taken into consideration * * * item No. 44 be and the same is hereby amended to and shall read to carry a total assessment of benefits of 764 units or $764.00." Thus, the court employed the words units and dollars as equivalents in meaning. It will be recalled that findings of commissioners remain ineffective until approved by the county court. After the modifications had been made the commissioners' report was approved. In its modified form (including the sheets and the 12 columns) it was made a part of the order of approval.

The commissioners, who assessed the benefits and damages under the Supplemental Plan for Reclamation, said in their report: "We have therefore followed the method of assessment used originally in making the assessment of benefits, that is to say, the method upon which the tax already levied against the other lands of the district is based." Having made that explanation, the report employed a sheet containing 12 columns similar to that used by the first body of commis-

sioners, with the exception of the 12th column. The first body of commissioners entitled their 12th column "Levy for Bond Issue"; the 1918 body used for that column the heading "Benefits Assessed." The column entitled Units contains a string of figures which total 11,920. After this report had been submitted the county court approved it. The order of approval carried a column entitled "Benefit" in which was entered the same figures that the commissioners had entitled "Benefits Assessed." We think that word was clearly a misnomer and that it was not intended to indicate Anticipated Benefits.

From the foregoing we see that the first body of commissioners found that 282,325.10 units would accrue from the Reclamation Plan and that the second body of commissioners found that 11,920 units would accrue from the Supplemental Plan for Reclamation. The total of these two sums is 294,245.10. The drainage tax record of the district for the year 1918 likewise carried a column entitled "Units." At the foot of the column is the total of the several entries. It is 294,245.10. After the report of the second body of commissioners had been approved by the county court the board of supervisors adopted a resolution (it authorized the issuance of the 1918 series of bonds ($15,000)) and declared: "The total assessment of benefits against all the lands of said Nyssa-Arcadia Drainage District is the sum of Two Hundred Ninety-four Thousand Two Hundred Forty-five 10/100 Dollars ($294,245.10)." From the foregoing we have an explanation of that total ($294,245.10); otherwise it is wholly unexplained. These circumstances show that by "units" was meant "dollars"—or anticipated benefits. We have also seen that the order of the county court in approving the report of the first body of commissioners used the

term units and dollars interchangeably. From the order of the board of supervisors just quoted we observe that it spoke of the total benefits aggregating $294,245.10, which is the sum derived from the addition of $282,325.10 and $11,920.00. Thus the supervisors dealt with units as the equivalent of dollars. And, finally, we see that the first drainage tax record which the district compiled after the annexation of the 204 acres carried the total of 294,245.10 under a column of figures entitled Units. If units was not used as meaning dollars, then we have no explanation whatever for these various columns and the repeated use of the term Units. We are satisfied that the column entitled Units was intended to indicate benefits and that the number of units was the amount in dollars that the plan would confer in benefits upon the various tracts of land.

■ We conclude from the foregoing that the issuance of the two series of bonds was well warranted by the benefits which reports of commissioners approved by the county court found would come from the contemplated reclamation work.

■ The contention of the defendants that 1915 Session Laws, Ch. 340, limits a board of supervisors to the levy of one tax only and that if the tax fails to yield enough for the payment of the outstanding bonds, no additional tax levy can be made, even though the assessed tax was far less in amount than the benefits reported by the approved report of the commissioners, is clearly without merit. More than one section of the 1915 act directly refutes this contention. We shall quote only one section (25); it says:

"In case the proceeds of the original tax levy made under the provisions of Section 17 of this

Act are not sufficient to pay the principal and interest of all bonds issued, then the board of supervisors shall make such additional levy or levies upon benefits assessed as are necessary for this purpose.''

We have carefully read *State ex rel. v. Little River Drainage District*, 334 Mo. 753, 68 S. W. (2d) 671, upon which the defendants rely. Although that case involved a drainage district and bonds issued by it, the nature of the controversy it submitted to the court was so dissimilar to the one before us that nothing said in deciding the issue would be likely to cast any light upon our case. We have found nothing in it at variance with our conclusion that the defendants are authorized to levy more than one tax. Volume 19, C. J. Drains, § 267, p. 748, and 28 C. J. S., Drains, § 76, p. 454, and the authorities cited in those sections, support the conclusion that we have just announced.

■■ The contention of the defendants that the issuance of the $15,000 of bonds was not preceded by a finding that the supplemental works would confer a benefit upon the original 5,090.83 acres, and that the required notice was not given to the owners of those tracts before the proceedings resulting in the issuance of the bonds were begun, in our opinion, lacks merit. In the first place, the defendants' answer says that after the Supplemental Plan for Reclamation had been adopted by the board of supervisors, commissioners were appointed who assessed the benefits and damages. Then, after the answer has averred that the commissioners filed their report August 23, 1917, it says: ''* * * thereafter, on to-wit, the 25th day of September, 1917, after due notice and hearing, the County Court of Malheur County, Oregon, by an order duly made and entered, settled and approved said report.'' Finally,

the statute does not require that additional benefits be assessed if the additional work does not exceed the original benefits. This contention is clearly without merit.

■ We now quote from 19 R. C. L., Municipal Corporations, § 301, p. 1007:

> "Where, by legislative enactment, authority has been given to the officers of a municipality to issue its bonds on some precedent condition, the recital in such bonds by the officers of the representative body invested with power to perform the condition, and with authority to determine when that condition has been performed, that all the requirements of law necessary to authorize the issue of the bonds has been fulfilled, precludes inquiry, as against an innocent purchaser for value, whether or not the precedent condition had been performed before the bonds were issued, and when it may be gathered from the enactment that those officers were invested with power to decide whether or not that condition had been fulfilled, their recital in the bond issued by them that it was fulfilled is duly authorized, and it estops the municipality from proving its falsity to defeat the bonds in the hands of an innocent purchaser."

■ We have seen that through assessments of benefits which secured the approval of the county court, and through the enactment of resolutions which authorized the issuance of the two series of bonds, the district's officers were authorized to sign the bonds. In all instances, according to the answer, the action was "duly" taken. The officers, therefore, had authority to make the recitals in the bonds which we quoted in a preceding paragraph. Those recitals are now conclusive upon the district and prevent the defendants, or estop them, from contending that an irregularity or

failure to make some entry denies validity to the bonds. Moreover, it will be seen from the defendants' own averments that the district for thirteen years recognized the bonds as valid and paid interest upon them. McQuillin on Municipal Corporations, 2d ed., § 2309, says: "* * * payment of interest for several years by the municipality estops it to set up mere irregularities in the issuance of bonds."

The foregoing principle of law disposes of all remaining issues presented by the defendants.

■ Seemingly, the defendants plead the mortgage and delinquent tax foreclosures by the state, county and defendant district as a defense. We feel safe in assuming that in every tax-levying municipality there are tax delinquencies and properties upon which the liens of delinquent taxes have been foreclosed. In all likelihood, in some counties the problem created by tax delinquencies is more aggravated than in this drainage district. The answer before us mentions no amounts or other details. It gives no further details of consequence than those stated in a preceding paragraph of this opinion. It asks for no advice from this court; nor does it afford sufficient information to warrant the proffer of advice. Clearly, the foreclosures amount to no defense in this proceeding.

The above disposes of every contention advanced by the defendants. The plaintiff's demurrer to the return and answer is sustained. They may have ten days' time in which to plead further. If no amended return is filed within that time, the writ will be made peremptory.

Motion to strike defendant's amended return allowed
September 29, 1942

ON MOTION TO STRIKE AMENDED RETURN
(129 P. (2d) 276)

Before KELLY, Chief Justice, BELT, BAILEY, LUSK, RAND, ROSSMAN and BRAND, Associate Justices.

*Gallagher & Gallagher*, of Ontario, for plaintiff.

*Carl H. Coad*, of Nyssa, and *Cochran & Eberhard*, of La Grande, for defendants.

ROSSMAN, J. Our order which sustained a demurrer to the defendants' return granted them ten days in which to plead further. Within the allowed time they filed an amended return. The matter is now before us upon a motion by the plaintiff to strike the amended pleading upon the ground that it does not state facts materially different from those alleged in the original return.

Section 1-714, O. C. L. A., provides that sham and frivolous answers may be stricken out on motion. *Farris v. Hayes*, 9 Or. 81, says:

"A pleading that is but a repetition of a former one adjudged insufficient, may be regarded as frivolous."

Many decisions by this court announced since that one illustrate the application of the principle which it

states. Accordingly, if the amended return submits the same matters that are stated in the original return and nothing else, it must be stricken from the files as frivolous.

The principal difference between the original and the amended return is that the latter includes papers which the defendants deem copies of minutes of the meetings of the commissioners who assessed the benefits and damages anticipated from the reclamation work. The copies of those papers and interpretative averments based upon them are virtually the only difference between the original and the amended pleadings. The defendants' purpose in making the amendments just mentioned was to show that the benefits, which the commissioners found, did not total $294,-245.10, as stated in our original opinion, but only $80,-104.47. If the benefits were found to be $80,104.47, then at least some of the relief which the plaintiff seeks is not available in this proceeding. The brief submitted in support of the amended return does not claim that we misinterpreted the original return or the statutes governing drainage districts, but it urges that the copies of the purported minutes show that the benefits were assessed by the commissioners in the sum last mentioned.

It will be recalled from our previous decision that after the supervisors of the drainage district had adopted a plan for the drainage of the district, the county judge of Malheur county appointed three commissioners charged with the duty of assessing the benefits and damages which would ensue from the construction of the project. The appointments were made obedient to the statutes which govern drainage districts. The commissioners later filed the report which is mentioned in our previous decision. The amended

return, referring to the commissioners, says: ''The record of their actions in so determining benefits, are set forth in the minutes of the meetings of such commissioners as follows: * * *'' Then follow quotations which purport to be copies of the minutes of five meetings of the commissioners.

The pleading does not state whether the minutes were ever filed in any public office. Likewise the pleading does not disclose the source from which the defendants obtained the minutes. There is no averment that anyone who purchased any of the bonds, which are the subject-matter of this proceeding, saw or knew of the minutes.

We shall now quote the parts of the minutes which the defendants seemingly believe are material to this cause. They follow:

''After having viewed the lands in question and now satisfying themselves as to the proper classification of all the lands in the District the commissioners then proceeded to assess the public highways, power and telephone lines and irrigation canals affected by the proposed plan of reclamation.

''The public utilities being assessed as follows:

| | |
|---|---|
| Malheur County | $2,180.00 |
| Electric Investment Co. | 150.00 |
| Malheur Home Telephone Co. | 150.00 |
| Owyhee Ditch Co. | 750.00 |
| Wilson Ditch | 500.00 |

''The commissioners then decided to give a benefit rating per acre to each class of land about as follows:

| | |
|---|---|
| Class 1, 25% benefit, or | $ 7.00 per acre |
| Class 2, 40% benefit, or | 11.20 per acre |
| Class 3, 40% benefit, or | 11.20 per acre |
| Class 4, 70% benefit, or | 19.60 per acre |
| Class 5, 80% benefit, or | 22.40 per acre |

"A motion was then made by W. B. Eaton, seconded by R. H. DeArmond, that C. F. Ashford draw up the Commissioners' Report, and that we now adjourn until such time said report is ready for our approval. Motion Carried and so ordered."

The above is the only part of the minutes to which the defendants' brief expressly refers. The quotation was made from the minutes of the fourth meeting of the commissioners; it was held on July 20, 1916. It will be seen from the minutes that at that meeting the commissioners devised "a benefit rating per acre" for each class of land "about as follows: * * *" and authorized one of the commissioners, C. F. Ashford, to draft the report. We now pass on to the minutes of the last meeting of the commissioners held on July 28, 1916. According to the copy which forms a part of the amended return, those minutes said:

"* * * The meeting was called to order by the chairman, C. F. Ashford, who announced that the report of the assessments of benefits and damages for each of the owners of the lands in the Nyssa-Arcadia Drainage District, was now tabulated and written up and ready for comparison with the original memorandum made by them on the ground.

"After the table appended in the report was examined and prepared, W. B. Eaton moved that part of the report be adopted and approved as the true findings of the Commissioners to accompany the written report. The motion was seconded by R. H. DeArmond and when put to a vote by the chairman was carried unanimously.

"When the written part had been typewritten it was read by the chairman and members of the Commission, and R. H. DeArmond moved, seconded by W. B. Eaton, that this part of the report be approved and adopted as the true report to accompany the table.

"When put by the Chairman, the motion was carried unanimously.

"The report was then signed by all the commissioners, and there being no further business, a motion to adjourn by W. B. Eaton, seconded by R. H. DeArmond, was carried."

■ As is indicated in our previous decision, 1915 Session Laws, Ch. 340, § 13 (§ 123-118, O. C. L. A.), says:

"The board of commissioners shall prepare a report of their findings which shall be * * * filed in the office of the county clerk."

As is further indicated in our previous decision, the board prepared a report and it was filed in the office of the county clerk. Our previous decision quoted the parts of the report which we deemed material. We shall revert to the report shortly. It will be observed that the statute contemplates that the board shall speak through its report—not through its minutes.

Section 13 of the act just mentioned (§ 123-120, O. C. L. A.) directs the county clerk, after receipt of the report, to publish for three weeks notice of the fact that the report is on file and that those interested may examine it. Section 15 (§ 123-121, O. C. L. A.) permits any owner of land in the district to file exceptions to any part of the report. It next says:

"All exceptions shall be heard by the court and such amendments and modifications made to the report of the commissioners as may in the judgment of the court be equitable, * * *."

The section next says that if the court finds that the estimated cost of the improvement is less than the estimated benefits "the court shall approve and confirm said commissioners' report as so amended and

modified." The section under review renders it the duty of the county clerk to transmit "a certified copy of the court decree and copy of the commissioners' report as confirmed or amended by the court" to the secretary of the board of supervisors of the district and to the recorder of each county in which land of the district lies. The section says: "The same shall become a permanent record." The final words of the section are: "Any person may appeal from the judgment of the court."

The act nowhere expressly prescribes a duty upon the commissioners to keep minutes, and, that being true, it, of course, makes no provision for the filing of minutes. The act does, however, require the commissioners to elect one of their number chairman, and further requires the secretary of the district's supervisors to serve the board of commissioners as secretary.

It will be helpful to recapitulate in chronological order: (1) After a district has adopted a plan for reclamation the county judge appoints three commissioners charged with the duty of assessing benefits and damages; (2) the action taken by the commissioners is indicated by their report which is filed in the office of the county clerk; (3) the county clerk publishes notice for three weeks that the report is on file in his office and that exceptions may be filed; (4) the county court is required to hear the objections and is granted the power, after determining the merits of the objections, to confirm, amend or modify the report; (5) "a certified copy of the court decree and copy of the commissioners' report, as confirmed or modified" by the county court are sent to the secretary of the board of supervisors and to the recorder of each county within which there lie lands of the district; and (6) those papers are "a permanent record."

The brief submitted by the defendants in support of their amended pleading says:

"That said commissioners prepared a report showing their assessment of benefits to all property benefited by the proposed Plan for Reclamation and listed and showed the acreage of each of the 5 classes of land held by each landowner, and listed the total benefits thereunto accruing at the respective rates of $7.00, $11.20, $19.60 and $22.40 in the 12th column thereof under the heading 'Levy for Bond Issue.' That in the 11th column thereof under the heading 'Cost Engineer's Estimate,' was shown the estimated cost of construction chargeable to each tract of land and property. That the 10th column of such report entitled 'Units' was a column of figures used for the convenience of the commissioners and engineer in computing the 11th column 'Cost Engineer's Estimate' and the 12th column of benefits entitled 'Levy for Bond Issue', in the following manner:

"* * * We believe that a sufficient allegation of facts has been made in this amended return to show that the commissioners did determine benefits of $80,104.47 and used the 'Units' column as a convenience in computation only."

By reverting to our original decision it will be seen that a part of the commissioners' report consisted of some sheets containing twelve columns. In the first column the commissioners entered the name of the owner of every tract of land in the district. In the second they wrote opposite the owner's name a legal description of his property. In the third they listed the section in which his tract was located. In the fourth they indicated the number of acres in his tract. For the time being we shall omit mention of the fifth, sixth, seventh, eighth and ninth columns. They are described at length in our previous opinion. We add, however,

that immediately over the fifth to the eleventh columns the commissioners wrote "Class of Land, Benefit Rating, and Cost per Acre on $70,000 Bond Issue." It will be seen from the paragraph above quoted from the defendants' brief that the defendants contend that the tenth column, which is headed with the word "Units" represents "figures used for the convenience of the commissioners and engineer" in computing the eleventh column. Our previous decision held that the tenth column contained the entry of the estimated benefits. Reverting again to the words above quoted from the defendants' brief, it will be seen that they concede that the commissioners entered in the eleventh column, which is entitled Cost Engineer's Estimate, the part of the construction cost which was chargeable to each tract of land. We construed the column in the same manner when we wrote our previous opinion. We come now to the twelfth column headed Levy for Bond Issue. Reverting to the defendants' above-quoted language, it will be seen that they claim that the commissioners entered in that column their determination of benefits and claim that these totaled $80,104.47. A few lines ahead of the quoted language to which we have just adverted the defendants said: "* * * listed the total benefits thereunto accruing at the respective rates of $7.00, $11.20, $11.20, $19.60 and $22.40 in the 12th column thereof under the heading 'Levy for Bond Issue.'" Thus the defendants construe the twelfth column, which has the heading Levy for Bond Issue, as being the determination by the board of the benefits which each tract would receive from the construction of the reclamation work. Our decision deemed the words "Levy for Bond Issue" to mean exactly what that language signifies. Hence, the defendants dis-

agree with us upon two columns, the tenth and the twelfth. The former is entitled Units and the latter Levy for Bond Issue. The defendants deem the column entitled Units, which we held was the determination of the benefits, a mere mathematical convenience to which the board resorted, and the twelfth column entitled Levy for Bond Issue the entry of benefits. The defendants do not claim that we misconstrued the commissioners' report, but argue that the minutes which the amended return submits render clear the meaning of the commissioners. Our original opinion found that the meaning of the report was evident.

Before considering the minutes we shall revert to columns five, six, seven, eight, nine and ten. Our previous opinion dwells at length upon those columns. We interpreted columns five to eleven as being classifications by the commissioners of every acre of land in the district according to the character of the land and the benefits which it would receive from the improvement. We remind ourselves of the heading which appears over those columns: "Class of Land, Benefit Rating * * *." Explanatory sentences in the report say, in part:

> "Column 5 Poor Dry Land is rated with the lowest benefit, 25, and will be taxes for the Bond issue $7.00. Column 6 Poor Wet Land is rated 40 and will be taxes for bond issue $11.20. * * * Column 8 Good Land That is losing Crop Production by reason of a rising water table: is rated at 70. and taxes $19.60. Column 9 Good land that is now swamp * * *. Column 10, Units, is formed by the sum of the units of Columns 5 to 9 inclusive. That is, the number of acres in each class multiplied by the rating of that class gives the number of units. * * *"

Over the eleventh column entitled Cost Engineer's Estimate there appears:

"Cost Engineer's Estimate
Per Acre
: #1- $5.575
: #2- 8.60
: #3- 8.60
: #4- 15.05
: #5- 17.20"

Immediately over the fifth column is the following:

"#1
7.00
25."

The heading of the eighth column is:

"#4
19.60
70"

and the ninth:

"#5
22.40
80"

A moment of patience and a study of the report render clear the meaning of those symbols. The symbol #1 refers to the like indicator in Cost Engineer's Estimate Per Acre, and, of course, is the means of apportioning. the engineer's estimate of cost of construction to each tract which is entered in the fifth column. The symbol 7.00 refers to the explanation which we quoted from the report beginning with words "Column 5 Poor Dry Land." It is there explained that land of that character "will be taxes for the bond issue $7.00." The figure 25 refers to the same quotation, that is, about poor dry land. As will be recalled, it says that that kind of land is "rated with the lowest benefit, 25."

The meaning of the entries becomes clear, we believe, when one of the tracts of land entered upon the sheets is taken for the purpose of illustration. The first tract entered was owned by L. Adams. We mentioned him in our previous opinion, but would like to carry the illustration a little further. As is shown by the fourth column, he owned a total of 19.55 acres in the district. None of his land was entered in the fifth, sixth or seventh columns, but we encounter a part of it in the eighth column, which is headed:

"#4
19.60
70"

There we find the figure 7.55. In the ninth column, headed:

"#5
22.40
80"

the commissioners entered the figure 12. The latter added to 7.55 is 19.55, the total acreage owned by Adams. In the tenth column, which is entitled Units, they entered 1488.5. In the eleventh column, which is entitled Cost Engineer's Estimate, they wrote 320.02, and in the twelfth column, entitled Levy for Bond Issue, we find 416.78.

We shall now explain how the commissioners derived 1488.5, 320.02 and 416.78. We shall begin with 1488.5. By writing 7.55 in the column at the head of which was 70, the commissioners found that 7.55 of Adams' acres would be benefited $70.00 per acre; and by writing 12 in the column over which 80 appeared they found that 12 of his acres would be benefited $80.00 per acre. $7.55 \times 70$ equals 528.50. $80 \times 12$ yields 960. 528.50 plus 960 equals 1488.50, being the entry in the

tenth column. We explained in our previous opinion that the commissioners thought that Adams would be benefited to the extent of $1488.50 by the improvement. We adhere to that belief. We come now to the entry opposite Adams' name in the column entitled Cost Engineer's Estimate. We have quoted the heading of the eighth column. It will be recalled that it includes the symbol #4. Under that symbol we find the aforementioned entry of 7.55. The symbol #4 manifestly refers to the like symbol in the data entitled Cost Engineer's Estimate Per Acre. There we find opposite the symbol #4, 15.05. 15.05 × 7.55 is 113.62. In the ninth column under the subtitle #5 we find opposite Adams' name the aforementioned entry 12. Opposite #5 in the Cost Engineer's Estimate Per Acre we find $17.20. 17.20 × 12 equals 206.40. That sum added to 113.62 gives a total of 320.02, being the entry which the commissioners placed in the eleventh column under the heading of Cost Engineer's Estimate. Manifestly, $320.02 was the commissioners' estimate of Adams' share of the bare cost of the improvement. That disposes of the eleventh column. We now come to the twelfth column entitled Levy for Bond Issue; it contains the entry 416.78. Clearly, the levy for the bond issue would have to be more than the engineer's estimate of the bare cost of construction. For instance, interest would have to be provided for. Moreover, the bonds might sell for less than par. The commissioners' report explains those matters and says that they also made an allowance for contingencies. We observed that 7.55 acres of Adams' land was in the eighth column and 12 of his acres in the ninth column. We have also seen that one of the headings of the eighth column is 19.60 and one of the headings of the ninth column is 22.40. The report explains that in Column 8, among other matters, the

commissioners entered: "Taxes $19.60." And it explains that in Column 9, among other entries, they wrote "Texas $22.40." Therefore, we believe that the symbol 19.60, which appears in the subtitle of Column 8, indicates the required levy upon the kind of land entered in Column 8; that is, "Good land that is losing crop production * * *," and that the subtitle entry, 22.40, in Column 9, was found to be the required levy upon the land entered under that subtitle. 19.60 × 7.55 equals 147.98. 22.40 × 12 equals 268.80. The total of those two sums is 416.78, which is the entry in the twelfth column entitled Levy for Bond Issue.

The above gives us a clear explanation of every entry in the columns of the report. The explanation in the defendants' brief, quoted in a preceding paragraph, renders the tenth column, entitled Units, virtually useless, and instead of making the twelfth column, entitled Levy for Bond Issue, mean what it says, converts it into an estimate of benefits.

█ As we have seen from our review of the applicable statute, the report had no effect until action was taken upon it by the county court. After the report of the commissioners was filed the county clerk published the required notice and exceptions were filed by some property owners. Still later hearings took place, in the course of which the exceptions filed by H. M. Plummer were sustained in part. All other exceptions were overruled. In the column entitled Units, opposite Plummer's name, the commissioners had entered 1528. In its order modifying the commissioners' report and approving it as modified, the county court wrote:

"It is further ordered that the remonstrance of the said H. M. Plummer be and the same is hereby sustained in part and the said assessment of benefits is hereby reduced by the sum of $764.00 and the

> assessment of benefits is hereby assessed in the sum of $764.00 or 764 units. That the Court herein in making such reduction has taken into consideration * * * and that item #44 be and the same is hereby amended to and shall read to carry a total assessment of benefits of 764 units or $764.00.''

Thus, the estimate of Plummer's benefits was reduced 50 per cent. As a result of this modification the total units were reduced from 283,089.1, as found by the commissioners, to 282,325.1, and the levy for bond issue was reduced from $80,104.47 to $79,890.55. No other alteration was made in the commissioners' report, but the order confirming it in its modified form said: ''One unit being equal to $1.00 of benefit.'' It will be observed by adverting to the above quoted paragraph that the county court used the word Unit and the dollar sign interchangeably.

Section 15 of the act from which we have quoted authorized the county court to take the action it pursued. That section authorizes county courts to amend or modify reports of commissioners, provided the notice has been given that is required by § 14 of the act. The defendants' answer concedes that the notice was duly published. Section 15 further provides that when a report has been approved, whether in its original condition or as modified, the report, together with the order of the county court pertaining to it, becomes ''a permanent record'' in the offices of the county recorder and of the secretary of the district. The same section further provides that any property owner affected by the report ''may appeal from the judgment of the court.'' Thus, it is certain that it is the order of the court, entered after notice, which gives finality and efficacy to the report of the commissioners.

The foregoing renders it clear that the findings of the assessing commissioners upon the subject of benefits were expressed in language capable of clear understanding. Very likely the commissioners could have chosen a better means of expression, but a little study of their report would render its meaning clear to anyone. The order of the county court, which made a modification in the commissioners' report and then approved it as modified, cleared the report of uncertainty if any existed. In its modified, approved form the report found that the project would bestow $282,325.10 in benefits upon the district.

The question now occurs whether the copies of the minutes of the meetings of the commissioners which form a part of the amended return are entitled to any effect whatever in this proceeding.

■ In considering that issue it is pertinent to take note of the fact that the relators are to be deemed holders in due course of some of the bonds issued by the defendant drainage district. The defendants admit that the relators own some of the bonds. The bonds described in the complaint are negotiable in form. A presumption is warranted that the relators are holders in due course. Section 69-409, O. C. L. A.; *Rivers Bros. v. C. F. T. Co., Inc.*, 124 Or. 157, 264 P. 368; Jones, Bonds and Bond Securities, 4th ed., § 295; and 11 C. J. S., Bills and Notes, § 654, p. 48.

■ It is inevitable that the officials of a municipality which contemplates the issuance of bonds will prepare in the course of their deliberations and negotiations some writings. Some may be minutes of meetings similar to those which form a part of the amended return. Some of the papers may be written upon the volition of the municipal officials and for their own

purposes, while others may possibly be written and kept because the statutes which control the municipality's right to issue bonds demand that such records be made and filed. Generally, the right to issue bonds is circumscribed with statutory limitations imposed for the protection of the municipality. Those limitations may deny the municipality the privilege of issuing bonds unless its officials or some commission appointed by them conduct an investigation exacted by the statutes and file a report of their findings. Limitations of that kind are conditions precedent to the right to issue bonds and must be met. In the present instance, the drainage district act, for the obvious purpose of imposing upon the municipality sound business methods, orderly procedure and the protection of its credit, demands that before a district can issue bonds (1) the supervisors of the district must adopt a plan for reclamation and then file it; (2) the county judge must appoint commissioners charged with the duty of assessing benefits and damages and the order making the appointment must be filed; (3) the commissioners must report their findings in writing and the report must be filed; (4) the county court must conduct a hearing upon the report and after the hearing enter an order in regard to the report, which order must be filed; and (5) the anticipated benefits must exceed the cost of construction.

 The above requirements are conditions which must be met before the drainage district's officials gain the right to issue bonds. Manifestly, the purposes of requiring a document to be filed are (1) to afford those affected by the document an opportunity to inspect it; and (2) to give notice of the contents of the document. All persons dealing with a municipality are charged

with notice of the laws which govern it and are, therefore, required to take notice of the public documents which the laws demand that the municipality's officials must prepare and file before they possess the right to act.

As we have seen, the report of the assessing officials, after being slightly modified, was approved by the county court and thereupon both the report and the county court's order were filed in the appropriate public offices. All of this is conceded by the amended return. Manifestly, anyone purchasing the municipality's bonds would be charged with notice of the two documents just mentioned. A problem very different from our present one would be submitted if the amended return stated that the two documents just mentioned failed to show that the benefits anticipated from the reclamation work were more than the cost of construction.

It will be seen from what we have already stated that the defendants propose to charge the relators with notice of the contents of documents which the drainage district act does not require to be filed in any public office and which, seemingly, were never filed among any public records. From 44 C. J., Municipal Corporations, § 4236, p. 1243, we now quote:

> "* * * but a purchaser is not charged with notice of parts of the record not connected with such bonds, nor is he required to look beyond the record; * * *"

From Jones, Bonds and Bonds Securities, 4th ed., § 309, we quote:

> "In a general sense, all persons are bound to take note of matters which are required to be spread upon the public records. That is what such records are for. In the matter of municipal bonds,

if purchasers were required to take notice of all things in connection with their issuance of which a public record is necessarily made, their negotiability would be greatly impaired and their free circulation from hand to hand would be clogged through the uncertainty as to their validity that would arise in the minds of intending purchasers who, in many cases, would not be conveniently at hand to make the necessary investigations. The result would be diminished marketability of public bonds, or their sale at any unprofitable figure.

"Properly, every step in the issuance of municipal bonds is made a matter of record—the petitions, if any, that are filed; the resolutions or ordinances of the governing body; the publications made; the elections called and held; the determination that a debt-limit has not been exceeded; the provisions for a tax levy to pay interest and principal; arriving at the form and terms of the bonds; and providing for their sale—somewhere there must be a record of each of such matters. Must a purchaser of the bonds investigate the records and decide their sufficiency at his peril when, in all other respects, he is qualified to become a holder in due course? There is no doubt that at an earlier day in the development of the law governing municipal bonds, the purchaser was required to take notice of all such records. Many losses to purchasers occurred through the operation of such a stringent requirement, and there came into vogue the practice of inserting in most bonds recitals to the effect that all of the conditions precedent had been complied with which, in general, the courts held to constitute estoppels against the issuing municipalities in favor of bona fide purchasers, and which were therefore deemed sufficient to absolve purchasers from the necessity of examining into the records to ascertain the existence of essential facts * * *.

"A sensible application of the Uniform Negotiable Instruments Law ought to absolve the pur-

chaser from the duty of taking notice of records of all those matters constituting the authority of municipal representatives to issue the bonds, as such term is distinguished from the power of the municipality mentioned at the beginning of this article. Under the Uniform Negotiable Instruments Law, notice means either actual knowledge of defects or infirmities in the bonds, or knowledge of such facts that the action of a purchaser in taking them amounts to bad faith. Of course, if a purchaser has actual notice that the records show some act or omission of the authorities that would invalidate the bonds, it would be an inane contention that he could become a holder in due course. Then the only other manner, under the section of the uniform act just cited, in which his status as a holder in due course could be assailed, would be that he had knowledge of such facts that his action in taking the bonds amounted to bad faith. How could it be an act of bad faith merely to omit to examine records made, or required to be made, by the very authorities who issue the bonds? Do they not, by executing, issuing, and sending them forth into the markets of the world, impliedly represent that they have performed all acts necessary to their validity? * * *

"The right of purchasers to rely upon recitals of the due performance of conditions precedent, made upon bonds by representatives authorized to determine the facts and to make the recitals, has gained general recognition."

█ █ We are clearly satisfied that the relators were not chargeable with notice of anything said in the minutes. That being true, their inclusion in the amended return, in our opinion, did not effect any change in the pleading material to this proceeding. The averments, which the amended return makes at variance with the contents of the report of the com-

missioners as approved by the court's order, are entitled to no effect. The report and the order are made by the defendants a part of the amended return and the parties deem the exhibits as controlling the averments.

We now go on to consider some other departures from the original return made by the amended pleading. Here and there the change consists of nothing more than the substitution of a synonym for a word found in the original pleading. However, the amended return dwells at length upon the 1918 issue of bonds ($15,000) and the benefits which it was anticipated would come from the supplemental plan for reclamation. It will be recalled that the 1918 issue was made after 204 acres had been added to the district. The defendants seem to believe that their additional averments indicate that the work, which was paid for out of the proceeds of this issue, was not performed upon and did not confer any benefit upon the original 5,090.83 acres. However, we observe that the resolution by the board of supervisors of the district, which authorized the issue of the bonds and levied the tax, said:

"WHEREAS, It has been found that the works set out in the Plan for Reclamation are insufficient to reclaim a part of the lands within said district, and the Board of Supervisors have formulated amended plans extending laterals and ditches so as to more effectually reclaim the said lands of said district, and to furnish the benefits assessed against said lands; and

"WHEREAS, additional works have caused an indebtedness, and it has been found that the total tax levied under the levy heretofore made, upon which bonds were issued to the amount of Seventy Thousand Dollars, and the proceeds from the sale

of said bonds is insufficient to complete the work of said district; and

"WHEREAS, the total assessment of benefits against all the lands of said Nyssa-Arcadia Drainage District is the sum of Two Hundred Ninety-four Thousand Two Hundred Forty-five 10/100 Dollars ($294,245.10); and the total taxes levied thereon is the sum of Eighty-one Thousand Nine Hundred Fifty-one 78/100 Dollars ($81,951.78); and the said district has issued and sold drainage bonds to the amount of Seventy Thousand Dollars ($70,000.00); and

"WHEREAS, it has been found that additional funds will be necessary to pay indebtedness and complete the work of said district, including the additional works found necessary, * * *"

It will be observed that the resolution indicates that the new work was to be performed, not only upon the additional 204 acres but also to "complete the work of said district." It seems to us that the resolution clearly indicates that the proceeds of the issue would be spent, in part, to "complete the work" paid for in large part by the 1916 issue.

 Our previous decision quoted the recital contained in the bonds of the drainage district which said that all conditions exacted by law as precedents to the issuance of the bonds had been faithfully fulfilled. We held that the recital estopped the defendants from alleging that the bonds were invalid because of some minor matters which they said the district's officials should have performed before issuing the bonds but failed to perform. The same matters are alleged in the amended return in somewhat amplified form. The principle which we had in mind is thus stated in *Klam-*

*ath Falls v. Sachs*, 35 Or. 325, 57 P. 329, 76 Am. St. Rep. 501:

"In legal effect, adequate recitals contained in negotiable municipal bonds are equivalent to a representation, or warranty, or certificate on the part of the officers, that everything necessary by law to be done has been done, and every fact necessary by law to have existed did exist, to make them legal and binding. * * *

"The gist of the rule is aptly stated by Mr. Justice Strong, in Town of Coloma v. Eaves, 92 U. S. 484, as follows: 'Where it may be gathered from the legislative enactment that the officers of the municipality were invested with the power to decide whether the condition precedent had been complied with, their recital that it has been, made in the bonds issued by them, and held by a bona fide purchaser, is conclusive of the fact, and binding upon the municipality; for the recital is itself a decision of the fact by the appointed tribunal.' Hence it may be stated, as a general rule, that recitals in bonds which functionaries of a municipality have been empowered to issue, respecting the existence of specified facts, and the performance of the requisite conditions which are within their appropriate functions or province to ascertain and determine, will estop the municipality to assert or maintain anything to the contrary as against the claim of innocent holders."

The recitals in question are made over the signatures of the defendant district's president and secretary. It is true that the drainage district act (1915 Session Laws, Ch. 340) did not expressly authorize those officials to include the recitals in the bonds. The question, therefore, occurs whether they had implied authority so to do. The following circumstances determine that issue. The defendant drainage district

was legally organized. The drainage district act authorizes such bodies to issue bonds: 1915 Session Laws, Ch. 340, § 25 (as amended, § 123-144, O. C. L. A.). The two officials who signed the bonds on behalf of the district had express authority so to do (same section as last cited). Obviously, before they signed the bonds it was the duty of those officials to determine whether the conditions precedent to the issuance of the bonds had been fulfilled. The authority to issue bonds grants authority to make the bonds negotiable in form: *Town of Klamath Falls v. Sach*, supra; and Jones, Bonds and Bond Securities, 4th ed., § 286. These bonds were negotiable. We believe that by necessary implication the authority to issue and sell these bonds carried with it authority to include the recitals: Jones, Bonds and Bond Securities, 4th ed., §§ 257 and 259.

We are satisfied that the recitals in the bonds estop the defendant drainage district from claiming, against the relators, that the supervisors who were in office when the bonds were issued omitted to perform any act required of them by the drainage district statute. The purchasers of the bonds were justified in believing the recitals contained in them. The statements there made were as effective to show compliance with the pertinent statutes as any other written record of their acts.

The extensive argument in the defendants' brief that the county court, upon a hearing of the exceptions filed against the report of the three assessing commissioners, had no right to increase the assessment of benefits, has no place in this proceeding. No increase was made. To the contrary, as already indicated, the total benefits were reduced by the county court $764,

and a corresponding reduction was made in the assessed tax.

■ Forming a part of the amended return is a prayer, which says in part:

> "These defendants further pray, that in event such answer and return be not found a sufficient defense, that for their direction and instruction in complying with any writ of mandamus that may issue, the following points of law and facts be specifically decided and explained, * * * :"

Then follow twelve "points of law and facts" many of which are accompanied with citations to previous decisions of this court. There is no averment that the defendants are unaware of the proper answers to the questions which they submit to us. The fact that they follow their questions with citations to Oregon decisions is an indication that they have the answers. Nor is it alleged that any action which the defendants may take in compliance with an order entered in this proceeding will meet with objection from those whom the defendants seem to fear. To answer all of the defendants' questions would require this court to write a textbook upon the subject of taxation and municipal securities. Seemingly, the defendants desire to convert this proceeding into one for an advisory opinion. We are satisfied that the prayer is inappropriate.

The above disposes of every issue properly before us. The motion to strike is allowed.